JOHN W. BERRY, Lead Counsel (Cal. Bar. No. 295760)
Email: berryj@sec.gov
ANSU N. BANERJE (DC Bar No. 440660)
Email: banerjeea@sec.gov

Attorneys for Plaintiff
U.S. Securities and Exchange Commission
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3890 (Berry)
           (323) 965-3313 (Banerjee)
Facsimile: (213) 443-1904

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | Case No. 2:16-CV-954 |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| JILBERT TAHMAZIAN, ESQ., | |
| Defendant. | |

Plaintiff United States Securities and Exchange Commission ("Commission") alleges:

**JURISDICTION AND VENUE**

1. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d)(1), & 77v(a)], and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), & 78aa(a)].

2. Defendant has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national

securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] because certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Defendant resides in this district in Glendale, California.

## SUMMARY

4. From at least mid-2009 through at least December 2010, Defendant Jilbert Tahmazian ("Defendant" or "Tahmazian"), a lawyer licensed in the state of California, participated in a fraudulent "prime bank" scheme. Prime bank schemes involve the offer and sale of fictitious investment programs claiming that investors' funds will be used to purchase and trade "prime bank" financial instruments on clandestine overseas markets to generate huge returns in which the investor will share. However, neither these instruments, nor the markets on which they allegedly trade, exist.

5. Tahmazian and his co-schemer offered and sold bogus investment contracts purporting to provide investors access to "a Financial Instrument issued by a top rated financial institution/top 50 bank with a minimum face value of $100 million" and "designated toward a 40-week private placement program." However, no such "financial instrument" or "private placement program" existed. Nonetheless, under the purported terms of the fraudulent investment contracts, investors were promised that they would receive a return of 15% to 30% *per week* from their investment or, if their money was not invested within 15 or 30 days, their funds, plus a 2% penalty, would be returned. Tahmazian and his co-schemer obtained approximately $6 million from at least four investors, who purchased these fraudulent investment contracts.

6. Tahmazian was an integral and knowing participant in the fraud. Among other things, investors were directed to deposit their money in Tahmazian's attorney-client trust account. However, the investors' funds were never applied toward any investment. Instead, after retaining a substantial "fee" for himself, Tahmazian transferred the investors' remaining money from his attorney-client trust account to his co-schemer, who in turn misappropriated the investors' money for their personal use, including lavish spending at Las Vegas casinos and high-end retail stores. The victims of the scheme lost their entire investments, with the exception of one investor who received a partial refund from Tahmazian of $100,000 from another investor's money that was being held in Tahmazian's attorney-client trust account.

7. In 2011, one of the victims of the scheme sued Tahmazian in California state court. The trial court found that Tahmazian and his co-schemer had perpetrated a "very sophisticated and financially successful fraud" and that Tahmazian's participation, as a licensed attorney, was "highly instrumental" to soliciting investors by adding an air of legitimacy to the scheme. The court ultimately found that Tahmazian was "a knowing participant in the fraud," adjudged him liable on multiple claims, and ordered him to pay back all of the investor's money – nearly $1.2 million. The judgment against Tahmazian was subsequently affirmed on appeal.

8. The Commission brings this action seeking permanent injunctive relief to prevent future violations of the federal securities laws, disgorgement of ill-gotten gains with prejudgment interest, civil penalties, and any other appropriate relief.

## THE DEFENDANT

9. Jilbert Tahmazian (age 55), a U.S. citizen and a resident of Glendale, California, is an attorney licensed to practice in California since 1989.

## FACTUAL ALLEGATIONS

10. Tahmazian maintains a solo, general law practice in Glendale, California, focused primarily on representing clients in criminal matters. In or about June 2009, Tahmazian met an individual who leased office space near Tahmazian's

law practice and with whom he would eventually perpetrate the fraud underlying this action (together with an entity owned and controlled by that individual and its employees, Tahmazian's "co-schemer").  Shortly thereafter, Tahmazian began providing general advice and other assistance to his co-schemer, and subsequently attended business meetings and communicated with potential investors in the fraudulent scheme.

11.     Tahmazian and his co-schemer enticed investors to enter into fake "prime bank" investment contracts on the promise of huge investment returns.  For example, two investors entered into a so-called "Management Agreement Contract" ("MAC") with an entity owned and controlled by Tahmazian's co-schemer.  Under the MACs, investors agreed to send a certain sum on money to Tahmazian's attorney-client trust account.  The MACs provided that, within fifteen days for one investor and within 30 days for another, the funds would be used to participate in a "private placement" in financial instruments, which, unbeknownst to the investors, did not exist.  One MAC claimed enormous historical average returns of 15% per week; another claimed historical average returns of an astronomical 30% per week.  The MACs did not describe how the purported investment would produce such huge returns.  Investors were further promised in the MAC that if their funds were not invested within 15 or 30 days, the funds would be returned with a 2% penalty.  On information and belief, each investor in the fraudulent scheme entered into substantially similar bogus investment contracts.

*Investor A*

12.     On or about December 21, 2009, Investor A entered into one such fraudulent investment contract and sent $2 million to Tahmazian's attorney-client trust account.  Upon receipt of the funds, Tahmazian disbursed $1,734,980 to his co-schemer, kept $40,000 for his fees, and disbursed the remainder to five other individuals.  On February 11, 2010, Investor A, through counsel, sent a letter to Tahmazian, stating that Tahmazian had failed to respond to repeated requests to

COMPLAINT                                           4

provide "an escrow letter or other verification that you are holding or disbursed such escrowed funds." In addition, Investor A demanded a refund of its $2 million.

13. On February 19, 2010, Investor A's counsel called Tahmazian to discuss the status of the investment. During that call, to placate Investor A's concerns, Investor A's counsel was assured that returns on the investment would be forthcoming. Tahmazian, however, knew that Investor A's money had been dissipated in contravention of the MAC. Specifically Tahmazian knew but concealed that the funds had not been invested, would not generate any profits, and had not been refunded.

*Investor B*

14. On January 25, 2010, another individual investor, Investor B, entered into a "Management Agreement Contract" ("MAC") with an entity owned and controlled by Tahmazian's co-schemer. Under the MAC, Investor B agreed to send $1 million to Tahmazian's attorney-client trust account. Within fifteen days, the funds would be used to "reserve a Financial Instrument issued by a top rated financial institution/top 50 bank with a minimum face value of $100,000,000 . . . ." The MAC stated that the funds were to be "designated toward a 40-week private placement program" with historical returns averaging 15% per week, but did not describe how the purported investment would produce such huge returns. Investors were further promised in the MAC that if their funds were not invested within 15 days, the funds would be returned with a 2% penalty. Tahmazian received and read a copy of the MAC provided to Investor B.

15. Exhibit A to the MAC included Tahmazian's attorney-client trust account information as the location for the investors to deposit funds. Investor B believed that Tahmazian would hold the funds in his attorney-client trust account until they were either invested or returned in accordance with the MAC.

16. In accordance with Exhibit A of the MAC, and with Tahmazian's knowledge and consent, Investor B wired $1,000,000 to Tahmazian's attorney-client

trust account in three installments on January 27 and 29, 2010. A few days later, on February 2, 2010, Tahmazian transferred a total of $979,940 to his co-schemer in three wire transfers and paid wire transfer fees of $60. Tahmazian kept the remaining $20,000 of Investor B's investment as a 2% "fee" paid for his services, general corporate work, and attending meetings with investors. Contrary to the express terms of the MAC, no investment was purchased or made with those funds and the funds were not returned within 15 days with the 2% penalty.

17. When Investor B did not receive the promised return on his investment, he attempted to contact but had experienced difficulty communicating with Tahmazian and his co-schemer. Investor B eventually contacted Tahmazian and demanded a refund of his $1 million investment with the 2% penalty set forth in the MAC.

18. In an attempt to mollify Investor B, Tahmazian's co-schemer sent a letter to Investor B and others via e-mail dated March 5, 2010 (more than a month after all funds were sent to Tahmazian's account), apologizing "for having to ask you to hold on for almost 6 weeks to start your trade as agreed upon by your contract . . . and/or pay out returns in some cases due to my serious battle with STOMACH Cancer [emphasis in original] . . . ." Investor A's counsel forwarded this e-mail to Tahmazian asking, "[c]an I safely assume that this came from [the co-schemer]?" At that time, Tahmazian knew that, contrary to the terms of the agreement that he had reviewed, Investor B's funds had not been invested in a "financial instrument" or placed into a 40-week "private placement program" and that the amounts also had not been returned to Investor B with a 2% penalty, as contemplated under the MAC.

19. Investor B continued to contact Tahmazian during 2010 to request a refund. On October 26, 2010, Tahmazian refunded $100,000 to Investor B. Tahmazian used money received in his attorney-client trust account from another $2 million investment made by another investor (Investor D discussed below) to fund Investor B's partial refund. Nothing in the MAC permitted Tahmazian to use one

COMPLAINT 6

investor's funds to repay another investor.  Tahmazian did not disclose the source of the refund to Investor B, and did not disclose the blatant misuse of Investor D's funds to Investor D.

*Investors C and D*

20. On or about January 12, 2010, another investor, Investor C, sent $1,000,000 to Tahmazian's attorney-client trust account pursuant to a similar fraudulent investment contract.  As with Investors A and B, Tahmazian knew that Investor C's money would not be, and ultimately was not, invested consistent with the investment contract and thus that it would not generate any profits and would not be refunded.  Similar to Investors A, B and C, on October 20, 2010, another investor – Investor D – also executed a similar fraudulent investment contract.  Investor D wired $2 million to Tahmazian's attorney-client trust account, having been promised the same investment opportunity and huge short-term returns on the investment.  Again, Tahmazian knew that the funds would not be and, ultimately, were not invested or returned to Investor D as required by the terms of the MAC.  Rather, almost immediately upon receipt of the funds, as noted above, on October 27, 2010, Tahmazian used part of the money to refund $100,000 to Investor A and, on November 3, 2010, sent a check for $1.5 million to a third-party.  Tahmazian kept the remaining $40,000, in violation of the MAC, for his "fees."

*The Fake Investment Contracts were Securities that were Offered and Sold in Unlawful Unregistered Transactions*

21. Sections 5(a) and (c) of the Securities Act prohibit the direct or indirect offer or sale of securities through the mail or interstate commerce unless a registration statement has been filed and is in effect.  No registration statement or exemptive form was filed with the Commission, and no exemption was applicable, with respect to the offer and sale of the "prime bank" investments by Tahmazian and his co-schemer.  Additionally, Tahmazian and his co-schemer did not provide any financial statements to investors, who were located in various states, and made no

effort to determine whether the investors were "accredited investors" to whom an exemption from registration might apply. In fact, they did not obtain financial information beyond whether investors had the ability to pay the initial fees.

*Tahmazian Found Liable in State Court Suit and Ordered to Return $1.2 Million to Investor B*

22. On June 16, 2011, Investor B filed suit against Tahmazian and his co-schemer for fraud and other claims in Los Angeles County Superior Court. Default judgments were entered against the co-schemer and the business entity he owned, controlled and used, with Tahmazian, to perpetrate the fraudulent scheme. Tahmazian appeared and defended the lawsuit. After a bench trial, the trial court found that Tahmazian was "a knowing participant in the fraud" on Investor B and had converted the $20,000 in "escrow fees." The trial court also rejected Tahmazian's principal defense, finding that "[b]ased upon the evidence, and the aforementioned lack of credibility of Tahmazian, the Court simply does not believe that the *admitted business attorney* . . . merely reviewed the Contract and found it to be legitimate" (emphasis in original). The trial court adjudged Tahmazian liable on multiple claims, and a judgment was entered requiring him to return Investor B's money – nearly $1.2 million including interest. The judgment was subsequently affirmed on appeal.

## FIRST CLAIM FOR RELIEF

**Violations of Securities Act Sections 17(a)(1) and (3)**

23. Paragraphs 1 through 22 are re-alleged and incorporated by reference.

24. By reason of the conduct described above, Defendant, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting with the requisite degree of knowledge or state of mind (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities. Defendant knew, or was reckless or negligent in not knowing, that

he employed devices, schemes and artifices to defraud and engaged in transactions, practices or courses of conduct that operated as a fraud on the investing public by, the conduct described in detail above, including among other things, engaging in a fraudulent prime bank stock offering scheme.

25. By reason of the conduct described above, Defendant willfully violated, and aided and abetted violations of, Securities Act Sections 17(a)(1) and (3) [15 U.S.C. § 77q(a)(1) and (3)].

## SECOND CLAIM FOR RELIEF

### Violations of Exchange Act Section 10(b) and Subsections (a) and (c) of Rule 10b-5

26. Paragraphs 1 through 25 are re-alleged and incorporated by reference.

27. By reason of the conduct described above, Defendant, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities. Defendant knew, or was reckless in not knowing, that he employed devices, schemes and artifices to defraud and engaged in transactions, practices or courses of conduct that operated as a fraud on the investing public by the conduct described in detail above, including, among other things, engaging in a fraudulent prime bank stock offering scheme.

28. By reason of the conduct described above, Defendant willfully violated, and aided and abetted violations of, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and subsections (a) and (c) of Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

### Violations of Securities Act Sections 5(a) and 5(c)

29. Paragraphs 1 through 28 are re-alleged and incorporated by reference.

30. By reason of the conduct described above, Defendant, directly or indirectly, willfully violated, and aided and abetted violations of, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)], by selling securities using the means or instruments of transportation or communication in interstate commerce or of the mails without a registration statement that has been filed and is effective and the transaction was not effected pursuant to a valid exemption from registration.

## FOURTH CLAIM FOR RELIEF

**Defendant Aided and Abetted Violations of Sections 5(a), 5(c), 17(a)(1), and 17(a)(3) of the Securities Act and Section 10(b) of the Exchange Act and subsections (a) and (c) of Rule 10b-5**

31. Paragraphs 1 through 30 are re-alleged and incorporated by reference.

32. By reason of the conduct described above, Tahmazian's co-schemer violated Sections 5(a), 5(c), 17(a)(1), and 17(a)(3) of the Securities Act and Section 10(b) of the Exchange Act and subsections (a) and (c) of Rule 10b-5 by knowingly engaging in a "prime bank" fraudulent scheme to defraud unsuspecting investors of at least $6 million.

33. By reason of the conduct described above, Defendant knowingly provided substantial assistance to and thereby aided and abetted his co-schemer in his violations of Sections 5(a), 5(c), 17(a)(1), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1), and 77q(a)(3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and subsections (a) and (c) of Rule 10b-5 [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

(a) Issue findings of fact and conclusions of law that Defendants committed the alleged violations;

(b) Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant, and his respective

officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from violating, or aiding and abetting violations of, directly or indirectly, Securities Act Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1) and 77q(a)(3)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Subsections (a) and (c) of Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5];

(c) Order Defendant to account for and disgorge all ill-gotten gains from his illegal conduct, together with prejudgment interest thereon;

(d) Order Defendant to pay civil penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

(e) Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

(d) Grant such other and further relief as the Court deems just and appropriate.

Dated: February 11, 2016                Respectfully submitted,

*/s/ John W. Berry*
John W. Berry
Ansu N. Banerjee
U.S. Securities and Exchange Commission
444 South Flower Street, Suite 900
Los Angeles, CA 90071
Tel: (323) 965-3890 (Berry)
     (323) 965-3313 (Banerjee)

Counsel for Plaintiff U.S. Securities and Exchange Commission